UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HENRY BENITEZ,

                    Plaintiff,

            v.

K. SALOTTI, Nurse, et al.,

                    Defendants.
_____

**DECISION AND ORDER**

6:16-CV-06219 EAW

## INTRODUCTION

Plaintiff Henry Benitez ("Plaintiff"), proceeding *pro se*, is an inmate currently housed at the Great Meadow Correctional Facility. Plaintiff brings the instant action pursuant to 42 U.S.C. § 1983, alleging that defendants ("Defendants") committed various violations of Plaintiff's constitutional rights while he was housed at the Five Points Correctional Facility ("Five Points") between 2014 and 2016. Presently before the Court is Defendants' motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. 87). For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

The following facts are taken from Defendants' Local Rule 56 Statement of Undisputed Facts (Dkt. 87-2),[1] Plaintiff's Statement of Facts (Dkt. 98), and their supporting documents.  Where the parties specifically controvert particular facts, the Court has noted the disagreement.

#### A.    October 16, 2014 Hospital Claim

On October 16, 2014, Plaintiff, who was housed at Five Points, was taken for treatment to Strong Memorial Hospital ("Strong") by Corrections Officers Jenkins, Schmidt, and Reynolds.  (Dkt. 87-2 at ¶¶ 1, 12, 14; Dkt. 98 at ¶¶ 1, 12, 14).  Plaintiff underwent a liver biopsy to determine if he had cancer.  (Dkt. 87-2 at ¶ 15; Dkt. 98 at ¶ 15).  During the biopsy, Plaintiff was in handcuffs and turned on his side until the biopsy was completed.  (Dkt. 87-2 at ¶ 16; Dkt. 98 at ¶ 16).  The medical records from Strong state that the biopsy was "[s]uccessful," but "[i]nconclusive for identifying tumor thrombus vs. [hepatocellular carcinoma] within liver parenchyma."  (Dkt. 87-2 at ¶ 19; Dkt. 98 at ¶ 19).  It was recommended that Plaintiff have a repeat biopsy "for definitive identification."  (Dkt. 87-2 at ¶ 19; Dkt. 98 at ¶ 19).

While the evidence of record shows that Plaintiff did file an initial grievance about the incident with the Inmate Grievance Resolution Committee ("IGRC") (Dkt. 99 at 18

---

[1]    Although Defendants do not make this clear, it appears they only concede certain facts as set forth herein for purposes of this motion.  (*See, e.g.*, Dkt. 87-11 at 18 ("*Plaintiff claims* that after the biopsy at Strong Memorial Hospital he was driven back to Five Points where he was beaten by CO Jenkins[.]" (emphasis added))).

(Grievance FPT-29548-14)), there is no record of the IGRC's decision being appealed to the Five Points superintendent or to the Central Office Review Committee ("CORC"), which is the body that renders the final administrative decisions under the DOCCS Inmate Grievance Program ("IGP") (Dkt. 87-9 at 32). Plaintiff contends that he submitted a letter of appeal to the IGRC asking for his appeal to be sent to the superintendent, and when he received no response, that he submitted a letter of appeal to the IGP clerk, but never received a response from CORC. (Dkt. 99 at ¶¶ 7-8).

**B.    October 16, 17, and 18, 2014 Claims**

After the biopsy, Plaintiff was transported back to Five Points. (Dkt. 87-2 at ¶ 20; Dkt. 98 at ¶ 20). Jenkins drove, with Reynolds in the front passenger seat and Schmidt behind Plaintiff in the van. (Dkt. 87-2 at ¶ 21; Dkt. 98 at ¶ 21). During the ride, Plaintiff was upset that his handcuffs were not removed at Strong for the procedure, and Plaintiff told Jenkins he would sue him. (Dkt. 87-2 at ¶ 22; Dkt. 98 at ¶ 22). Jenkins drove the van to a barn outside the Five Points perimeter, exited the van, opened the van door, and repeatedly punched Plaintiff over a two-minute period. (Dkt. 87-2 at ¶¶ 23-24; Dkt. 98 at ¶¶ 23-24). Defendants contend that the blows to Plaintiff's arms and chest did not hurt but left red marks and that the only pain Plaintiff recalls from the injury was the pain from the biopsy incision site (Dkt. 87-2 at ¶¶ 25, 27), and Plaintiff does not remember if the blows to his head caused him pain or left marks (Dkt. 87-2 at ¶ 26; Dkt. 98 at ¶ 26). Schmidt and Reynolds did not strike Plaintiff, but also did not say or do anything. (Dkt. 87-2 at ¶ 28; Dkt. 98 at ¶ 28).

Jenkins drove the van into the Five Points truck trap before escorting Plaintiff back to the infirmary with an unnamed corrections officer. (Dkt. 87-2 at ¶¶ 30-32; Dkt. 98 at ¶¶ 30-32). Once they arrived in an infirmary room, Plaintiff was pushed against a wall, and Jenkins punched Plaintiff all over and removed the Band-Aid on Plaintiff's biopsy incision. (Dkt. 87-2 at ¶ 33; Dkt. 98 at ¶ 33). The unnamed officer punched Plaintiff in his testicles and legs. (Dkt. 87-2 at ¶ 34; Dkt. 98 at ¶ 34). The beating lasted two minutes and ended when Plaintiff's restraints were removed and Plaintiff passed out. (Dkt. 87-2 at ¶ 35; Dkt. 98 at ¶ 35). As a result of the beating by Jenkins, Plaintiff suffered from redness and bruising that quickly healed (Dkt. 87-2 at ¶ 36; Dkt. 98 at ¶ 36), and Plaintiff claims the attack by the unnamed officer left a lump on his testicle and caused him to urinate blood for three weeks (Dkt. 87-2 at ¶ 37; Dkt. 98 at ¶ 37). Plaintiff remained in the infirmary room and saw three unnamed nurses who did not offer to treat Plaintiff for his alleged injuries. (Dkt. 87-2 at ¶ 38; Dkt. 98 at ¶ 38).

On October 17, 2014, Plaintiff was still in the infirmary. (Dkt. 87-2 at ¶ 39; Dkt. 98 at ¶ 39). Sergeant Williams ("Williams") was going into a room across the hall from Plaintiff's room, and Plaintiff called out to him. (Dkt. 87-2 at ¶¶ 40-41; Dkt. 98 at ¶¶ 40-41). They had a conversation about how Plaintiff was beaten and wanted to see a nurse, but Williams stated he did not care and walked off. (Dkt. 87-2 at ¶¶ 41-42; Dkt. 98 at ¶¶ 41-42). Plaintiff wanted the nurses to examine his testicles, paperwork recording his injuries so he could use the records for a lawsuit, and a provide new Band-Aid for the incision site. (Dkt. 87-2 at ¶¶ 43-44; Dkt. 98 at ¶¶ 43-44). Later, Plaintiff stopped Captain Norris ("Norris") during his rounds (Dkt. 87-2 at ¶ 45; Dkt. 98 at ¶ 45), and Defendants

contend that Plaintiff complained to Norris who said he would investigate the complaint (Dkt. 87-2 at ¶ 46). Plaintiff dropped his pants and showed Norris his testicles as well as the incision site. (*Id.* at ¶ 47; Dkt. 98 at ¶ 47). Norris gave instructions to Williams, and while Plaintiff did not hear the instructions, he believes Norris directed Williams to investigate the situation but not to photograph Plaintiff's testicles. (Dkt. 87-2 at ¶ 48; Dkt. 98 at ¶ 48).

Williams and Corrections Officer Pierce ("Pierce") escorted Plaintiff to the examination room. (Dkt. 87-2 at ¶ 49; Dkt. 98 at ¶ 49). Pierce photographed Plaintiff, but when Plaintiff asked Williams to photograph his testicles, Williams said no. (Dkt. 87-2 at ¶¶ 50-51; Dkt. 98 at ¶¶ 50-51). The photographs of Plaintiff reveal a red mark on Plaintiff's abdomen from the biopsy incision site. (Dkt. 87-2 at ¶ 52; Dkt. 98 at ¶ 52). After the photos were taken, Nurse B. Jones approached Plaintiff and questioned him about the alleged assaults. (Dkt. 99 at 29). Plaintiff told her that he had been beaten and that his testes hurt, and that he was "suing sweetheart." (*Id.*). Nurse B. Jones stated that she ended the encounter because Plaintiff was being uncooperative. (*Id.*). Nurse B. Jones has not been served with the Complaint, and is not presently before the Court. (Dkt. 87-2 at 14 n.2).

Later on that day, Dr. Trabout came into the infirmary room, and Plaintiff told him about the alleged beating. (*Id.* at ¶¶ 53-54; Dkt. 98 at ¶¶ 53-54). Defendants contend that Dr. Trabout visually examined Plaintiff's testicles but did not touch them, and said he did not see anything wrong. (Dkt. 87-2 at ¶ 55). Dr. Trabout inspected the biopsy incision site and said it looked fine, and Plaintiff did not complain to the doctor about his head, chest,

- 5 -

or arms. (*Id.* at ¶¶ 56-57; Dkt. 98 at ¶¶ 56-57). The ambulatory health record ("AHR") from Dr. Trabout's medical exam notes that Plaintiff suffered from "[n]o evident injury," and that Plaintiff "was/is being treated from a scrotal infection," but that there was "no evidence of any acute trauma in [Plaintiff]'s groin." (Dkt. 87-2 at ¶ 58; Dkt. 89 at 28). Defendants contend that Nurse Salotti was not in the room with Dr. Trabout to hear the conversation. (Dkt. 87-2 at ¶ 60).

At 8:30 p.m. that night, Plaintiff was transferred back to the special housing unit ("SHU"), and Nurse Salotti told Plaintiff that a nurse at the SHU would examine him. (*Id.* at ¶¶ 61-62; Dkt. 98 at ¶¶ 61-62). Nurse Cheasman made medication rounds in the SHU, and Plaintiff called out to her and told her he was in pain and had a lump on his testicles, but she did not stop and talk to him. (Dkt. 87-2 at ¶¶ 63-64; Dkt. 98 at ¶¶ 63-64). The morning of October 18, 2014, Defendants contend Nurse Tracey Jones ("Nurse T. Jones") came to see Plaintiff due to a sick call slip he submitted stating he had blood in his urine, but Plaintiff declined to provide a urine sample. (Dkt. 87-2 at ¶ 66; Dkt. 98 at ¶ 66). A medical record from November 13, 2014, states that Plaintiff's mental health unit counselor informed Nurse T. Jones that there was "a noted 'lump'" in Plaintiff's groin area, that Plaintiff's medical provider was made aware, and that Plaintiff's appointment date was moved up. (Dkt. 99 at 35).

On November 2, 2014, Plaintiff submitted a grievance regarding the events on October 16 and 17 to the IGRC (Dkt. 87-2 at ¶ 9; Dkt. 99 at 26 (Grievance FPT-29575-14)), and appealed the unfavorable decision to the superintendent (Dkt 87-9 at 32). However, CORC has no record of a grievance appeal for this grievance. (Dkt. 87-6 at ¶ 11;

Dkt. 87-9 at 32).  Plaintiff contends he filed a timely letter of appeal of the superintendent's decision to the IGP clerk, but received no response from CORC.  (Dkt. 99 at ¶ 10).  Additionally, Plaintiff claims he submitted a grievance about the events on October 18, 2014 (Dkt. 99 at ¶¶ 11-13), but there is no record of this grievance.

### C.     November 2014 Claims

On November 5, 2014, Plaintiff underwent another liver biopsy, which revealed the presence of liver tumor cells.  (Dkt. 87-2 at ¶ 68; Dkt. 98 at ¶ 68).  Plaintiff subsequently began treatment for the cancer.  (Dkt. 87-2 at ¶ 69; Dkt. 98 at ¶ 69).  On November 6, 2014, Jenkins and Schmidt came to the infirmary to take Plaintiff on a medical trip, but the medical trip was terminated after an argument.  (Dkt. 87-2 at ¶ 70; Dkt. 98 at ¶ 70).  Plaintiff alleges that Jenkins told him that he would transport Plaintiff to Strong in the future and "fuck you up," and that Jenkins and Schmidt told him: "we're both going to fuck you up next time."  (Dkt. 98 at 22; Dkt. 1 at ¶ 78).  Defendants contend that Plaintiff does not know why the trip was canceled and does not recall if Plaintiff told Jenkins and Schmidt that he was not going to go.  (Dkt. 87-2 at ¶ 71).  Plaintiff was escorted back to the SHU and claims he had liver pain as a result of the missed medical appointment.  (Dkt. 87-2 at ¶¶ 72-73; Dkt. 98 at ¶¶ 72-72).

Plaintiff filed a grievance regarding this incident and appealed the IGRC's decision to the Five Points superintendent, but there is no record of the grievance being appealed to CORC.  (Dkt. 87-9 at 32 (Grievance FPT-29636-14)).  Plaintiff contends that he did not receive a timely response to his appeal of the IGRC's decision from the superintendent,

and that he filed a letter of appeal with the IGP clerk but never received a response from CORC.  (Dkt. 99 at ¶ 14).

### D.     December 1, 2014 Claims

On December 1, 2014, Plaintiff was in his SHU cell standing by his door while Superintendent Sheahan ("Sheahan"), Deputy Superintendent Thoms ("Thoms"), and Deputy Superintendent Coveny ("Coveny") were conducting rounds.  (Dkt. 87-2 at ¶ 75; Dkt. 98 at ¶ 75).  Plaintiff called out to them and told them about the events of October 16, 2014.  (Dkt. 87-2 at ¶ 76; Dkt. 98 at ¶ 76).  Sheahan, Thoms, and Coveny said they would investigate, but they never did, and Jenkins continued to take Plaintiff on medical trips. (Dkt. 87-2 at ¶ 77; Dkt. 98 at ¶ 77).  There is no record of a grievance regarding this incident.  Plaintiff claims he filed a grievance, but that it was never processed by the IGRC. (Dkt. 99 at ¶¶ 15-17).

### E.     December 2014 Pain Medication and Infirmary Claims

On December 18, 2014, Plaintiff underwent a medical procedure.  (Dkt. 87-2 at ¶ 78; Dkt. 98 at ¶ 78).  From December 19, 2014, to December 24, 2014, Plaintiff asked for the pain medication Percocet, but was told that the medication would be given to him in the infirmary.  (Dkt. 87-2 at ¶ 79; Dkt. 98 at ¶ 79).  Defendants contend that Plaintiff denied pain and refused admission to the infirmary, but was told that if he had unbearable pain, he could be admitted to the infirmary for pain control.  (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90).  Defendants contend that on December 23, 2014, Plaintiff refused antibiotics and instead took the medication in his hand and told the nurse he would take it later.  (Dkt. 87-2 at ¶ 86; Dkt. 98 at ¶ 90).

From December 24, 2014, to December 29, 2014, Plaintiff was in the infirmary to receive the pain medication. (Dkt. 87-2 at ¶ 80; Dkt. 98 at ¶ 80). Plaintiff was on special "feed up" procedures in the infirmary because he had thrown a container of milk from his SHU cell at a corrections officer. (Dkt. 87-2 at ¶ 81; Dkt. 98 at ¶ 81). Plaintiff did not receive his morning and mid-day meals on December 26, 27, and 28, 2014, when Corrections Officer Gould ("Gould") was working, but does not know exactly what days. (Dkt. 87-2 at ¶¶ 82-84; Dkt. 98 at ¶¶ 82-84). Gould would walk by with Plaintiff's meal, and when he asked her about his food, she would continue to walk and ignore Plaintiff. (Dkt. 87-7 at 178). Additionally, when Plaintiff did receive meals during that time period, it was a tray of Jell-O. (*Id.* at 182). Plaintiff does not remember telling the nurses about his lack of food. (Dkt. 87-2 at ¶ 85; Dkt. 98 at ¶ 85). On December 29, 2014, Defendants contend Plaintiff was in the infirmary when an unnamed nurse told Nurse Salotti Plaintiff was not taking his medications, and that Plaintiff was later discharged back to the SHU. (Dkt. 87-2 at ¶ 87).

Plaintiff filed a grievance regarding the denial of pain relief medication (Dkt. 87-10 at 6 (Grievance 29856-15)), but there is no record of the grievance being appealed to the superintendent or to CORC (*id.* at 5; Dkt. 87-6 at ¶ 11). Plaintiff's claims regarding Gould were fully grieved. (Dkt. 99 at 37 (Grievance FPT-29839-15); Dkt. 87-10 at 5).

### F. January 2015 Claims

The morning of January 13, 2015, it was cold and snowy, and Jenkins, Corrections Officer Joseph Lunduski ("Lunduski"), and Sergeant Matthew Krzeminski ("Krzeminski") transported Plaintiff to Upstate Hospital. (Dkt. 87-2 at ¶ 94; Dkt. 98 at ¶ 94). Plaintiff

complained that the handcuffs were too tight, but he does not remember if the belly chain was a problem. (Dkt. 87-2 at ¶¶ 94, 96; Dkt. 98 at ¶¶ 94, 96). Plaintiff has a history of cutting himself, including slashing his arms on July 27, 2015 and August 8, 2015, after he heard voices telling him to kill himself. (Dkt. 87-2 at ¶¶ 108-09; Dkt. 98 at ¶¶ 108-09).

In the van, Plaintiff sat in the second row behind Plexiglas. (Dkt. 87-2 at ¶ 100; Dkt. 98 at ¶ 100). Jenkins opened the driver-side window, and some of the cold air came back to where Plaintiff was seated. (Dkt. 87-2 at ¶¶ 101, 103; Dkt. 98 at ¶¶ 101, 103). Defendants contend Plaintiff did not discuss being cold during the trip, but Plaintiff denies these allegations. (Dkt. 87-2 at ¶ 104; Dkt. 98 at ¶ 104). On the way back from the hospital, Jenkins did not allow Plaintiff to wear his coat. (Dkt. 87-2 at ¶ 99; Dkt. 98 at ¶ 99).

There is no record of a grievance being filed regarding the events of January 13, 2015. (*See* Dkt. 87-10 at 5). Plaintiff contends he filed a grievance with the IGRC, but that it was not processed. (Dkt. 99 at ¶¶ 19-20).

## G.    Fall 2015 Denial of Medical Care Claims

On September 19, 2015, Plaintiff was at Upstate Medical Center to have a thermal ablation, which is a procedure where the abdomen is punctured by a needle which burns a lesion. (Dkt. 87-2 at ¶ 112; Dkt. 98 at ¶ 112). Plaintiff was prescribed Percocet after his medical procedures. (Dkt. 87-2 at ¶ 120; Dkt. 98 at ¶ 120). Plaintiff returned to Five Points that day, first going to the infirmary and then the SHU. (Dkt. 87-2 at ¶ 113; Dkt. 98 at ¶ 113). Plaintiff does not remember a problem with Nurse T. Jones upon arriving back at Five Points, nor does he remember if he refused treatment that day. (Dkt. 87-2 at ¶¶ 114-15; Dkt. 98 at ¶¶ 114-15). In his Complaint, Plaintiff alleged that on September 30,

2015, he requested his prescribed pain medication from Nurse Salotti but she refused to give it to him.  (Dkt. 1 at 29).  However, Plaintiff concedes he does not remember having contact with Nurse Salotti on September 30, 2015, although he did speak with her on many occasions, and she told him he would not get a narcotic.  (Dkt. 87-2 at ¶¶ 117-18; Dkt. 98 at ¶¶ 117-18).  Plaintiff filed a grievance about Nurse Salotti refusing to give him pain medication on September 30, 2015 (Dkt. 87-10 at 12 (Grievance FPT-30385-15)), and the grievance was fully exhausted (Dkt. 87-2 at 5).

In early October 2015, Nurse T. Jones would walk by Plaintiff's cell without giving him his medication, but stated that Plaintiff repeatedly refused his medication.  (Dkt. 87-2 at ¶¶ 123-24; Dkt. 98 at ¶¶ 123-24).

Plaintiff informed Superintendent Colvin on October 5, 2015, that he had been denied medication for his liver cancer, and that he had been assaulted by Jenkins and Schmidt (Dkt. 87-2 at ¶ 137; Dkt. 98 at ¶ 137), but Plaintiff contends that Colvin told him that "no one likes you" and did nothing.  (Dkt. 100 at 36; *see* Dkt. 1 at ¶¶ 110-11).  There is no record of a grievance having been filed about Plaintiff's conversation with Colvin.  Plaintiff claims that he filed a grievance with the IGRC, but that it was never processed.  (Dkt. 99 at ¶¶ 24-26).

Also on October 5, 2015, Plaintiff complained to Lieutenant Marketos ("Marketos") and Casper during rounds that he had a painful, bleeding anus and wanted medical treatment, but Marketos and Casper did not say anything.  (Dkt. 87-2 at ¶¶ 130-31; Dkt. 87-10 at 17; Dkt. 98 at ¶¶ 130-31).

On October 7, 2015, Corrections Officer Labrake ("Labrake") looked into Plaintiff's cell to see if Plaintiff was properly dressed and then told the nurse that Plaintiff refused his medications. (Dkt. 87-2 at ¶ 138; Dkt. 98 at ¶ 138). On October 9, 2015, Plaintiff asked Nurse T. Jones and another nurse for his medication, but they walked by his cell and indicated that Plaintiff had refused treatment. (Dkt. 87-2 at ¶ 140; Dkt. 98 at ¶ 140). Plaintiff contends that Nurse T. Jones repeatedly falsely reported that Plaintiff refused his medication. (Dkt. 100 at 33; *see* Dkt. 1 at ¶¶ 101-08).

Defendants contend that on October 15, 2015, Nurse Salotti and Nurse Jensen discontinued Plaintiff's medications due to the repeated reports that Plaintiff was refusing his medication. (Dkt. 87-2 at ¶ 148). The medications that were discontinued included Colace for constipation, and the nutritional supplement Boost. (Dkt. 87-2 at ¶¶ 150-51; Dkt. 98 at ¶¶ 150-51).

Plaintiff filed grievances throughout October regarding Nurse T. Jones, McIntyre, Casper, Marketos, and LaBrake, which were all treated as the same grievance. (Dkt. 87-10 at 13-19 (Grievance FPT-30609-15)). The grievance was fully exhausted. (*Id.* at 5).

On October 30, 2015, Nurse Spencer[2] made a sick call round with Corrections Officer Jarzyna ("Jarzyna"). (Dkt. 87-10 at 21). Nurse Spencer did not stop at Plaintiff's cell to address a sick call slip he had submitted, and ignored Plaintiff when he called for her. (*Id.*). Jarzyna approached and asked why Plaintiff was yelling, and Plaintiff told Jarzyna that his sick call slip had been ignored by Nurse Spencer. (*Id.*). Jarzyna left

---

[2]     Plaintiff referred to Nurse Spencer as "Spinner" in his Complaint.

without getting him treatment. (Dkt. 87-2 at ¶ 156; Dkt. 98 at ¶ 156). Plaintiff was seen by a nurse on October 31, 2015. (Dkt. 87-2 at ¶ 157; Dkt. 98 at ¶157). Plaintiff submitted a grievance about this incident, which was fully exhausted. (Dkt. 87-10 at 21 (Grievance FPT-31039-15)); *id.* at 5).

## H.    October 14, 2015 Claims[3]

On October 14, 2015, Plaintiff was going to Upstate Medical Center with Corrections Officers Schmidt, Alvaro, and Glasser. (Dkt. 87-2 at ¶ 141; Dkt. 98 at ¶ 141). Plaintiff told Schmidt, who was driving, that he was going to sue him. (Dkt. 87-2 at ¶ 142; Dkt. 98 at ¶ 142). Schmidt stopped the van, got out, opened the side door, got in the van, and punched Plaintiff once in the face and told Plaintiff, "Sue me for that." (Dkt. 87-2 at ¶ 143; Dkt. 98 at ¶ 143). The punch gave Plaintiff red skin, a cut in the mouth, and a broken molar. (Dkt. 87-2 at ¶ 144; Dkt. 98 at ¶ 144). They then drove back to Five Points, and Plaintiff went to the infirmary before returning to the SHU. (Dkt. 87-2 at ¶ 145; Dkt. 98 at ¶ 145). Plaintiff submitted a grievance about this incident with regards to Schmidt, which was fully exhausted. (Dkt. 87-10 at 20 (Grievance FPT-30940-15)); *id.* at 5). However, Alvara and Glasser were not referred to in the grievance. (Dkt. 87-10 at 20).

## I.    November and December 2015 Claims

On November 4, 2015, Plaintiff was scheduled to go on a medical trip to an outside hospital. (Dkt. 87-2 at ¶ 158; Dkt. 98 at ¶ 158). Plaintiff contends he was fully restrained in the front lobby of Five Points, and Jenkins and Schmidt threatened to shoot Plaintiff.

---

[3]    Defendants do not move for summary judgment as to the excessive use of force claim against Schmidt related to this incident. (Dkt. 87-11 at 46).

(Dkt. 87-2 at ¶ 160; Dkt. 98 at ¶ 160). Plaintiff threatened to file a grievance against the officers present, and Jenkins and Schmidt falsely represented that Plaintiff refused to go to his appointment. (Dkt. 87-10 at 22). Plaintiff was then escorted back to the SHU. (Dkt. 87-2 at ¶ 160; Dkt. 98 at ¶ 160). Defendants state that Plaintiff refused to go to the hospital "as long as security assigns individuals that put their hands on me." (Dkt. 87-2 at ¶ 161; Dkt. 98 at ¶ 161). Nurse Salotti attempted to discuss the risks and consequences of refusing to go to the hospital with Plaintiff, but Plaintiff banged on the cell door and told her to "get the fuck out" of there. (Dkt. 87-2 at ¶ 162; Dkt. 98 at ¶ 162). Plaintiff contends that from November 4, 2015 to March 14, 2016, Nurse Salotti ignored his repeated requests to see an outside oncologist and hematologist for treatment. (Dkt. 100 at 39; *see* Dkt. 99 at 43). Plaintiff filed a grievance with regards to the actions of Jenkins and Schmidt that was fully exhausted. (Dkt. 87-10 at 5, 22 (Grievance FPT-30940-15)). Although Defendants contend that Plaintiff did not submit a grievance regarding the November 4, 2015 claims Salotti (Dkt. 87-11), Plaintiff filed a grievance against Salotti regarding her alleged refusal since November 4, 2015, to schedule Plaintiff for outside medical treatment. (Dkt. 99 at 43 (Grievance FPT-31515-16)).

Plaintiff wrote to Deputy Superintendent Lamana about his missed medical trip on November 22, 2015, to which Lamana responded on December 8, 2015, noting that the records indicated Plaintiff refused numerous outside trips. (Dkt. 87-2 at ¶¶ 168-69). On December 3, 2015, Plaintiff wrote to Commissioner Annucci about the lack of cancer treatment. (Dkt. 87-2 at ¶ 164; Dkt. 98 at ¶ 164). Dr. Koenigsmann wrote back on December 23, 2015, stating that Plaintiff's treatment was being monitored. (Dkt. 87-2 at

¶ 165; Dkt. 98 at ¶ 165).  Plaintiff previously filed a lawsuit against Dr. Koenigsmann in the Northern District of New York, which was dismissed.  (Dkt. 87-2 at ¶ 166; Dkt. 98 at ¶ 166).  There is no record of grievances regarding the responses to Plaintiff's letters.

### J.     2016 Transfer to Elmira Claims

On February 10, 2016, Hill informed Plaintiff that a transfer recommendation was being filed (Dkt. 87-2 at ¶ 174; Dkt. 98 at ¶ 174), and on September 13, 2016, Plaintiff was transferred to the Elmira Correctional Facility ("Elmira") (Dkt. 87-2 at ¶ 175; Dkt. 98 at ¶ 175).  Plaintiff's cancer treatment was restarted at Elmira.  (Dkt. 87-2 at ¶ 176; Dkt. 98 at ¶ 176).  Plaintiff did not want to be transferred from Five Points because he thought the transfer would delay his treatment.  (Dkt. 87-2 at ¶ 177; Dkt. 98 at ¶ 177).  There is no record of a grievance about Plaintiff's objection to the transfer.

## II.     Procedural Background

Plaintiff filed the instant lawsuit on April 4, 2016.  (Dkt. 1).  The Court issued a screening order on June 17, 2016, allowing Plaintiff's claims to go forward.  (Dkt. 8).  Defendants filed their Answers on October 4, 2016 (Dkt. 20; Dkt. 21; Dkt. 22; Dkt. 23; Dkt. 24; Dkt. 25; Dkt. 26; Dkt. 27; Dkt. 28; Dkt. 29; Dkt. 30; Dkt. 31; Dkt. 32; Dkt. 33; Dkt. 34; Dkt. 35; Dkt. 36; Dkt. 37; Dkt. 38; Dkt. 39; Dkt. 40; Dkt. 41; Dkt. 42; Dkt. 43; Dkt. 44; Dkt. 45; Dkt. 46), October 14, 2016 (Dkt. 49), and October 19, 2016 (Dkt. 51).  Discovery closed on February 28, 2017 (Dkt. 79), and Defendants filed the instant motion for summary judgment on May 31, 2018 (Dkt. 87).  Plaintiff submitted his response on October 1, 2018.  (Dkt. 98; Dkt. 99; Dkt. 100).

**DISCUSSION**

**I.    Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654

- 16 -

F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.  **Exhaustion**

Defendants argue that the following claims should be dismissed for failure to exhaust: the October 16, 2014, deliberate indifference claims against Jenkins related to the events at Strong; the October 16, 2014, excessive force and failure to intervene claims against Jenkins, Schmidt, and Reynolds; the October 17, 2014, failure to investigate and conspiracy claims against Williams, Norris, and Pierce; the October 17, 2014, deliberate indifference claims against Trabout, Salotti, and Cheasman; the October 18, 2014, deliberate indifference claims against Nurse T. Jones; any claims related to the November 6, 2014, incident against Jenkins and Schmidt; any claims against Sheahan, Thoms, and Coveny related to the December 1, 2014, events; any claims against Salotti and the Jane Doe nurse related to Plaintiff's alleged denial of medication in December 2014; the January 13, 2015, excessive force and unlawful conditions of confinement claims against Jenkins, Lunduski, and Krzeminski; the September 20, 2015, deliberate indifference claims against Nurse T. Jones; the October 5, 2015, deliberate indifference claim against Colvin; the October 14, 2015, failure to protect claims against Alvaro and Glasser; the November 4, 2015, deliberate indifference and retaliation claims against Jensen and Salotti; the deliberate indifference claim against Dr. Koenigsmann; and the unlawful transfer claim against Lamana and Hill.

Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to [CORC]. In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983.

*Crenshaw*, 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory— unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011).

Pursuant to the Second Circuit's decision in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.'" *Dabney v. Pegano*, 604 F. App'x 1, 3 (2d Cir. 2015) (quoting *Hemphill*, 380 F.3d at 686). However, the third prong of *Hemphill*, relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016). *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill* is now considered "entirely

within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

With respect to the burden of proof, "failure to exhaust is an affirmative defense" which "must be pleaded and proved by a defendant." *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 580 (S.D.N.Y. 2015) (citations and quotations omitted). However, once a defendant demonstrates that the plaintiff has not exhausted his administrative remedies, "the burden of proof shifts to the plaintiff to show his case falls under at least one of the exceptions" to the exhaustion requirement. *Perry v. Rupert*, No. 9:10-CV-1033 LEK/TWD, 2013 WL 6816795, at *4 (N.D.N.Y. Dec. 20, 2013); *see also Hubbs v. Suffolk Cty. Sheriffs Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (once defendants meet their initial burden of showing failure to exhaust, the burden shifts to the plaintiff "to demonstrate that other facts . . . rendered a nominally available procedure unavailable as a matter of fact").

As a preliminary matter, Plaintiff concedes that he failed to file grievances against Alvaro, Glasser, Koenigsmann, Lamana, Hill, and Jensen, and that those claims should be dismissed. (Dkt. 100 at 37, 40). Accordingly, the Court grants Defendants' motion as to the claims against Alvaro, Glasser, Koenigsmann, Lamana, Hill, and Jensen.

As for the remaining claims listed above, with the exception of the November 4, 2015 retaliation claim against Salotti,[4] Defendants have met their initial burden of

---

[4]     Defendants contend that Plaintiff did not submit a grievance regarding the November 4, 2015 claims against Jensen and Salotti. (Dkt. 87-11). While Plaintiff concedes he did not grieve the claim against Jensen (Dkt. 100 at 39), he has submitted a grievance he filed against Salotti regarding her alleged refusal since November 4, 2015, to schedule Plaintiff for outside medical treatment. (Dkt. 99 at 43 (Grievance FPT-31515-16)).

demonstrating Plaintiff failed to exhaust these claims. Defendants submitted records of all the grievances filed by Plaintiff with the IGRC in 2014 and 2015 and the appeals history of each grievance. (Dkt. 87-9 at 32; Dkt. 87-10 at 5). According to the lists, while confined at Five Points, Plaintiff successfully filed and appealed 25 grievances during 2014 and 2015. (Dkt. 87-9 at 32; Dkt. 87-10 at 5). At least five of those grievances are relevant to Plaintiff's claims in the instant matter (FPT-29839-15, FPT-30385-15, FPT-30609-15, FPT-30940-15, FPT-31039-15). (Dkt. 87-9 at 32; Dkt. 87-10 at 5).

Plaintiff maintains that he filed grievances and letters of appeal for the claims that Defendants move to dismiss for failure to exhaust, which were "confiscated" by prison guards at Elmira and Attica. (Dkt. 99 at ¶ 5). However, Plaintiff does not submit evidence nor allege with any specificity as to when or how these documents were confiscated at Elmira or Attica, or who he originally handed the grievances or letters to at Five Points for submission to the IGP.[5] The Court also notes that while in DOCCS custody, as of September 26, 2016, Plaintiff successfully used the IGP to its fullest extent on 677 other occasions. (Dkt. 87-9 at 3-30). Plaintiff's unsupported and unspecified statements are insufficient to create a genuine issue of material fact. *See Scott v. Kastner-Smith*, 290 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (quotation omitted)); *Mims v. Yehl*, No. 13-CV-6405-FPG, 2014 WL

---

[5] Plaintiff has submitted letters with requests for status updates regarding grievances he submitted in early 2014 and May 2016, all of which are unrelated to the instant matter. (Dkt. 99 at 9-16).

4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he submitted a grievance is "insufficient at the summary judgment stage"); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers . . . fails to excuse [the] inmate from fully grieving remedies[.]" (citation omitted)).

Moreover, as previously discussed, Plaintiff successfully filed and exhausted 25 grievances throughout 2014 and 2015. (*Id.* at 5). As such, the Court finds the record is consistent with finding the grievance process was available to Plaintiff. *See Davis v. Grant*, No. 15-CV-5359 (KMK), 2019 WL 498277, at *9 (S.D.N.Y. Feb. 8, 2019) (plaintiff's unsupported statements failed to create issue of fact, in part, where plaintiff successfully used IGP on 39 previous occasions); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (grievance process not unavailable where evidence demonstrated that four grievances were filed within a year of purportedly lost grievance), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017); *McKinney v. Prack*, 170 F. Supp. 3d 510, 517 (W.D.N.Y. 2016) (finding plaintiff's allegations that IGP refused to process grievances did not raise issue of fact where record showed that plaintiff "appealed and exhausted approximately 20 grievances during his 29 years of incarceration").

The Court acknowledges that "[t]his may seem like a harsh result, but it is compelled by the plain language of the [Prison Litigation Reform Act ('PLRA')]." *Keitt v. NYS Dep't of Corr. & Cmty. Supervision*, No. 11-CV-855-LJV-MJR, 2017 WL 9471826, at *6 (W.D.N.Y. Jan. 4, 2017). Binding Supreme Court precedent makes clear that the PLRA,

which governs in the instant matter, establishes a mandatory exhaustion regime that forecloses judicial discretion, *see Ross*, 136 S. Ct. at 1857; *Woodford v. Ngo*, 548 U.S. 81, 95 (2006) ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]"), and here, as discussed above, there is no statutory exception to this mandatory exhaustion requirement that Plaintiff's claims fall under. Accordingly, the Court grants summary judgment as to Plaintiff's unexhausted claims as listed above.

## III.   Deliberate Indifference Claim—Gould

Defendants contends that Plaintiff's Eighth Amendment claim against Gould should be dismissed.[6]  The Court denies Defendants' motion as to this claim for the reasons below.

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  The assessment of whether the measures taken are reasonable turns on an analysis of two factors.  First, the inmate must show that "objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quotation omitted).  Second, the inmate must demonstrate that "the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety."  *Id.*

---

[6]    Defendants make no arguments with regards to the retaliation claim against Gould. (*See* Dkt. 8 at 6 (screening order allowing retaliation claim against Gould to proceed to service)).  Accordingly, Defendants' motion is denied as to that claim.

(quotation and alteration omitted). Deliberate indifference must be measured subjectively, that is:

> [A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to [the] inmate['s] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Plaintiff suffered a sufficiently serious deprivation. "'[A] substantial deprivation of food' can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment." *Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). The record viewed in the light most favorable to Plaintiff shows that he was denied at least two out of three meals for three of the days that he was in the infirmary due to severe pain from his cancer treatment, and that the meals he did receive consisted of a tray of Jell-O. (Dkt. 87-7 at 178, 182). "When a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal served is nutritionally adequate." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001). Defendants have presented no evidence that a tray of Jell-O is nutritionally adequate. The Court finds that a reasonable trier of fact could determine that depriving a cancer patient of two out of three meals for three days and otherwise only giving him Jell-O presented an immediate danger to Plaintiff's health and well-being. *See Williams v.*

- 23 -

*Coughlin*, 875 F. Supp. 1004, 1011-13 (W.D.N.Y. 1995) (denying summary judgment where the plaintiff was deprived of five consecutive meals over a two-day period).

The cases cited by Defendants are not dispositive. Defendants cite two cases where the courts addressed the deprivation of one to three meals total, *see Butler v. Hogue*, No. 9:08-CV-264 GLS DRH, 2010 WL 4025886, at *3 (N.D.N.Y. Oct. 13, 2010) (finding the "[d]eprivation of only two meals over a two-day period" did not rise to level of Eighth Amendment violation), *aff'd*, 434 F. App'x 36 (2d Cir. 2011); *Benjamin v. Kooi*, No. 9:07-CV-0506, 2010 WL 985844, at *11 (N.D.N.Y. Feb. 25, 2010) (dismissing claim where the plaintiff claimed "that he was essentially denied anywhere from one to three meals"), *report and recommendation adopted*, No. 9:07-CV-0506LEK/DRH, 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010), whereas here the record viewed in the light most favorable to Plaintiff shows he was deprived of two out of three meals over a three day period, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at *3 (W.D.N.Y. Feb. 27, 2012) (denying summary judgment where the plaintiff claimed he was denied seven meals in a four day period). Defendants also cite a case where the court found denying an inmate food for two or three days was not sufficient to state an Eighth Amendment claim. *See Barclay v. New York*, 477 F. Supp. 2d 546, 545-55 (N.D.N.Y. 2007). Although it is true that like the *Barclay* plaintiff, Plaintiff's medical records do not mention his pain, the record before the Court supports that Plaintiff was in pain—the reason Plaintiff was in the infirmary was to receive pain medication. (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90). Additionally, the *Barclay* court further noted there was "no evidence that the denial of food was done maliciously to cause pain," *id.* at 555, whereas here the record viewed in the light

most favorable to Plaintiff shows that Gould purposely ignored Plaintiff when he asked for his meals.  (Dkt. 87-7 at 178).  Accordingly, Defendants' motion for summary judgment is denied as to the claims against Gould.

**IV.** **September 30, 2015 Denial of Medical Care Claim Against Salotti**

Plaintiff claims that Salotti's refusal to give Plaintiff the narcotic Percocet was deliberate indifference to a serious medical need.  A reasonable trier of fact could not find that Salotti's conduct amounted to a violation of Plaintiff's constitutional rights for the reasons that follow.

"The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).  An Eighth Amendment claim arising out of inadequate medical care requires a plaintiff-inmate to demonstrate that a defendant was deliberately indifferent to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A claim for deliberate indifference has both an objective and a subjective component.  *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

Objectively, a medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay . . . in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying

medical condition alone." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (quotation and original alteration omitted). It is appropriate "to consider the absence of concrete medical injury as one of the relevant factors in determining whether the asserted deprivation of medical care was sufficiently serious to establish a claim under the Eighth Amendment." *Smith v. Carpenter*, 316 F.3d 178, 189 (2d Cir. 2003).

"Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the 'equivalent of criminal recklessness.'" *Lapierre v. County of Nassau*, 459 F. App'x 28, 29 (2d Cir. 2012) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Specifically, a plaintiff must prove that the prison official knew of a serious medical condition and nonetheless disregarded the plaintiff's medical needs. *Farmer*, 511 U.S. at 837 (holding that a prison official does not act in a deliberately indifferent manner towards an inmate unless he "knows of and disregards an excessive risk to inmate health or safety"); *see also Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("To establish deliberate indifference, . . . [a] plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). More than medical malpractice is required to establish a constitutional violation. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness[.]"). Similarly, mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

The record does not support that Plaintiff's medical need was serious. On September 19, 2015, Plaintiff had undergone a thermal ablation procedure at a hospital, and when he returned to Five Points he stayed in the infirmary overnight, although his medical records indicate that he did not want to stay overnight. (Dkt. 89-3 at 25). Plaintiff returned to the SHU on September 20, 2015. (*Id.*). There is no evidence in the record that Plaintiff complained of pain between the time of his return to the SHU on September 20, 2015, and September 30, 2015. Additionally, Plaintiff's medical records from September 30, 2015, indicate that his pain was "intermittent" and "changes with positioning." (*Id.*). "It is well-established that such minor injuries do not normally rise to the level of seriousness required to support a viable claim [of] medical indifference under the Eighth Amendment." *Cintron v. Reome*, No. 914CV0116TJMDEP, 2016 WL 4063765, at *6 (N.D.N.Y. June 29, 2016) (collecting cases), *report and recommendation adopted*, No. 914CV116TJMDEP, 2016 WL 4098581 (N.D.N.Y. July 28, 2016); *see Salaam v. Adams*, No. 9:03CV0517(LEK/GHL), 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006) (finding no serious medical need where the medical records indicated that the plaintiff exhibited no signs of injury "during the days and weeks following the alleged assault," and where the records indicated that the complaints were "sporadic in nature and not of such severity as to be 'urgent'").

Additionally, the record before the Court does not show that Salotti acted with deliberate indifference. Plaintiff does not contend that Salotti refused to treat him; instead, Plaintiff claims that on September 30, 2015, Salotti refused to give him pain medication "prescribed by his outside treating oncologist" (Dkt. 1 at ¶ 102), which Plaintiff later stated

was the narcotic Percocet (Dkt. 87-7 at 238).  The record does not demonstrate that Five Points was in receipt of a prescription from any outside treating physician.  (*See* Dkt. 89-3 at 25 (medical record from September 30, 2015, stating Plaintiff requested two "medications ordered by specialist," but noting there were "none in the records")).  In any event, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.  A prisoner "is not entitled under the Eighth Amendment to the best treatment available; he is merely entitled to 'reasonable care.'"  *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (citing *Salahuddin*, 467 F.3d at 279).

The record before the Court shows that Nurse Salotti advised Plaintiff that no medication would prevent the type of discomfort described by Plaintiff at that time, *i.e.*, "occasional jolts" of pain.  (Dkt. 87-4 at ¶ 13).  There is no evidence in the record contradicting this assertion, or demonstrating that such a statement would be more than malpractice or negligence.  *See Estelle*, 429 U.S. at 106 ("A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness[.]").  Additionally, the record supports that Five Points had a policy of only giving narcotics to prisoners admitted to the infirmary.  (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90); *see Trammel v.*

*Keane*, 338 F.3d 155, 163 (2d Cir. 2003) (discussing that courts should accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979))). Accordingly, a reasonable trier of fact looking at the record before the Court could not find that Nurse Salotti acted with deliberate indifference on September 30, 2015, by not giving Plaintiff a narcotic, and Defendants' motion is granted with respect to that claim.

## V.    October 5, 2015 Claims

Defendants contend the Court should grant summary judgment as to Plaintiff's failure to protect claims against Casper and Marketos, regarding his rectal bleeding on October 5, 2015, as well as the denial of medical care claims against Nurse T. Jones. The Court disagrees for the following reasons.

With respect to claims for failure to protect, the Second Circuit has explained as follows:

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has

knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (internal citations omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

The record before the Court viewed in the light most favorable to Plaintiff demonstrates that Plaintiff complained to them on October 5, 2015, that he had a painful, bleeding anus and wanted medical treatment, but that Marketos and Casper did not do or say anything about Plaintiff's complaints. (Dkt. 87-2 at ¶¶ 130-31; Dkt. 87-10 at 17). Further, the record viewed in the light most favorable to Plaintiff shows that when he informed Nurse T. Jones about his rectal bleeding, she merely told him to put in for a sick call and did not treat him. (Dkt 87-10 at 17). Defendants argue that the bleeding from Plaintiff's anus "was a reoccurring problem," and that Plaintiff "was regularly seen by medical care providers" at that time. (Dkt. 87-11 at 38). However, nothing in the medical records indicates that Plaintiff received treatment in October 2015 for his rectal bleeding. (*See* Dkt. 89-3 at 26-27; Dkt. 87-10 at 26). The Court finds that a reasonable trier of fact could find the alleged actions by Marketos and Casper amounted to a failure to protect and that the alleged actions by Nurse T. Jones constituted deliberate indifference to a serious medical need, and the Court denies Defendants' motion as to these claims.

## VI.    October 30, 2015 Claims Against Jarzyna and Spencer

The Court finds that the record does not support a deliberate indifference claim against Jarzyna and Nurse Spencer. Plaintiff claims that on October 30, 2015, he was ignored by Jarzyna and Nurse Spencer even though he submitted a sick call slip and made

oral complaints to them, and as a result he "continued to suffer from severe pain in his liver due to the cancer therein." (Dkt. 1 at ¶¶ 118-19). However, nothing in the record indicates that Plaintiff's treatment suffered an unreasonable delay. Plaintiff was seen by a nurse the next day, and the medical records indicate that a copy of his sick call was made and forwarded to his provider. (Dkt. 89-3 at 28). Additionally, when Plaintiff requested that the nurse give him the pain medication prescribed by his outside oncologist, she informed him that Nurse Salotti had already made a recommendation for the pain medication. (*Id.*). The record does not show that Plaintiff's treatment would have been any different if Nurse Spencer had attended to him the night before. *See Bilal v. White*, 494 F. App'x 143, 146 (2d Cir. 2012) (holding summary judgment was appropriate where the record demonstrated no "serious consequence at all from the delay in treatment"); *Carpenter*, 316 F.3d at 187 ("[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."). Accordingly, a reasonable trier of fact could not find on the record before the Court that any delay in Plaintiff's treatment led to other consequential injurious effects, and the Court grants Defendants' motion as to the claims against Jarzyna and Spencer.

## VII.   <u>October 2015 Denial of Medication Claims</u>

The Court finds there are genuine issues of material fact with respect to Plaintiff's October 2015 denial of medical care claims against Nurse T. Jones, McIntyre, and LaBrake.

Defendants contend that Plaintiff repeatedly refused to take his medication for a period of approximately two weeks in October 2015, and as a result administration of his medications—which included Corgard for high blood pressure, Colace for constipation, and a multivitamin—was discontinued. (Dkt. 87-11 at 37). Plaintiff, on the other hand, argues that he did not refuse to take his medications, but instead that Nurse T. Jones, McIntyre, and LaBrake, as well as Nurse Baker who has not yet been served, would not give him his medication throughout October, and then falsely reported that he was refusing to take it. (Dkt. 87-2 at ¶¶ 123, 138, 140; Dkt. 87-10 at 16). Although Plaintiff admits that he does not "have a problem with constipation" (Dkt. 87-7 at 288), the record before the Court viewed in the light most favorable to Plaintiff shows that discontinuing the high blood pressure medication contributed to his rectal bleeding (*id.* at 287-88). The Court finds that a reasonable trier of fact viewing the record in the light most favorable to Plaintiff could determine that repeatedly failing to administer medication to Plaintiff and then falsely reporting that Plaintiff was refusing to take that medication, resulting in the discontinuance of Plaintiff receiving his high blood pressure medication and the continuance of his rectal bleeding, constitutes deliberate indifference to a serious medical need. Therefore, Defendants' motion is denied as to these claims.

## VIII.  November 4, 2015 Claims

Defendants argue the retaliation and denial of medical care claims against Jenkins, Schmidt, and Williams for the events of November 4, 2015 should be dismissed. The Court finds there are genuine issues of material fact regarding these claims.

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkeiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). A plaintiff asserting First Amendment retaliation claims must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "The filing of formal prisoner grievances is protected conduct under the First Amendment." *Shariff v. Poole*, 689 F. Supp. 2d 470, 478 (W.D.N.Y. 2010) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis*, 320 F.3d at 353). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.'" *Lashley v. Wakefield*, 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (quoting *Gill*, 389 F.3d at 381). "This objective inquiry is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise." *Dawes*, 239 F.3d at 493 (internal quotation omitted). "Prisoners may be required to tolerate

more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis*, 320 F.3d at 353.

In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Shariff*, 689 F. Supp. 2d at 479. "The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation[.]" *Candelaria v. Higley*, No. 04-CV-0277(MAT), 2013 WL 104910, at *9 (W.D.N.Y. Jan. 8, 2013) (citing *Colon*, 58 F.3d at 872-73). Accordingly, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Defendants contend that on the morning of November 4, 2015, Plaintiff refused to go on a medical trip to get a C.T. scan of his liver and was returned to the SHU. (Dkt. 87-2 at ¶ 161). However, Plaintiff takes the position that he did not refuse to go, but that Jenkins and Schmidt verbally threatened Plaintiff in front of Williams, and when Plaintiff stated he would file grievances against them, they cancelled the trip and falsely reported that he refused to go. (Dkt. 87-10 at 22). As a result, Plaintiff's cancer treatment was delayed. (Dkt. 87-7 at 302). The Court finds that a reasonable trier of fact viewing the record in the light most favorable to Plaintiff could find that prison guards lying to cancel Plaintiff's

medical appointment, which resulted in delayed cancer treatment, amounts to deliberate indifference to a serious medical need.

Additionally, Defendants are not entitled to summary judgment with regards to the retaliation claim against Schmidt, Jenkins, and Williams. The record viewed in the light most favorable to Plaintiff shows that Plaintiff threatened to file a grievance against Jenkins, Schmidt, and Williams, and that immediately afterwards they cancelled Plaintiff's medical appointment scheduled for that day. A reasonable trier of fact could find this conduct amounts to retaliation.

Defendants argue that "verbal harassment does not rise to the level of a constitutional violation." (Dkt. 87-11 at 42). While Defendants make an accurate statement of the law, *see Davis*, 320 F.3d at 353 ("'[S]arcastic' comments, without more, do not constitute an adverse action."), the issue of material fact in dispute is not whether Jenkins and Schmidt verbally harassed Plaintiff in front of Williams, but whether Plaintiff's medical appointment for his cancer treatment was cancelled by Jenkins, Schmidt, and Williams because Plaintiff threatened to filed grievances against them. Accordingly, the Court denies Defendants' summary judgment motion as to the November 4, 2015 claims against Jenkins, Schmidt, and Williams.

## IX.    Remaining Claims Against Salotti

Defendants contend summary judgment should be granted as to the remaining retaliation and denial of medical care claims against Salotti for her alleged refusal to schedule Plaintiff's outside medical treatment for his liver cancer after November 4, 2015. The Court agrees for the following reasons.

Defendants point to multiple portions of the record to support their position that the reason Plaintiff did not receive treatment for his liver cancer after November 4, 2015, was because of his refusal to attend his scheduled medical appointments. For example, a refusal of medical examination form from January 16, 2016 states Plaintiff "refused medical services after throwing milk on an officer." (Dkt. 89-2 at 40). Additionally, in Salotti's declaration made under penalty of perjury, she states that Plaintiff's treatment was interrupted because he "had several incidents of self-harm which resulted in him being in Mental Health Unit[] observation cells or [the] infirmary one on one watch" (Dkt. 87-4 at ¶ 25), and that Plaintiff's treatment resumed after March 14, 2016, after Salotti discussed with him "the need to avoid refusals of medication and treatment" (*id.* at ¶ 26). The only evidence of record in support of Plaintiff's position are statements that Salotti has "refused since November 4, 2015 . . . to schedule me for outside medical treatment for my liver cancer" and that "Salotti continues to deny me urgently needed medical treatment for my cancer." (Dkt. 99 at 43). The Court finds that these conclusory allegations without the support of any other evidence of record are insufficient to withstand summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."); *Smith v. County of Nassau*, No. 12-CV-4344 SJF GRB, 2014 WL 2862849, at *6 (E.D.N.Y. June 18, 2014) (granting summary judgment where the plaintiffs did not dispute the justifications offered by the defendants "except to offer a conclusory, unsupported statement"). Accordingly, the Court grants Defendants' motion for summary judgment as to the remaining claims against Salotti.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendants' motion for partial summary judgment. (Dkt. 87). The only claims remaining in the instant lawsuit related to the Defendants presently before the Court are the December 2014 deliberate indifference/conditions of confinement and retaliation claims against Gould; the October 5, 2015 failure to protect claims against Casper and Marketos and deliberate indifference claim against Nurse T. Jones; the October 2015 deliberate indifference for denial of medication claims against Nurse T. Jones, McIntyre, and LaBrake; the October 14, 2015 excessive use of force claim against Schmidt; and the November 4, 2015 deliberate indifference and retaliation claims against Jenkins, Schmidt, and Williams. The Clerk of Court is directed to terminate the following Defendants as parties to this action: Salotti, Reynolds, Alvaro, Glasser, Norris, Pierce, Trabout, Cheasman, Sheahan, Thoms, Coveny, Jensen, Ludenski, Krzeminski, Colvin, Jarzyna, LaMana, Hill, Spencer,[7] and Koenigsmann.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: April 8, 2020
 Rochester, New York

---

[7] As previously noted, Plaintiff referred to Spencer as "Spinner" in the Complaint, and she is so listed in the caption.